**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIVIL ACTION NO. |
| Petitioner, | : | 3:14-CV-1558 (JCH) |
| | : | |
| v. | : | |
| | : | |
| AJAY S. AHUJA, M.D., | : | MAY 5, 2017 |
| Defendant. | : | |

**RULING ON PENALTIES**

**I. INTRODUCTION**

On November 22, 2016, Dr. Ajay S. Ahuja, M.D. ("Dr. Ahuja"), the defendant,

admitted liability for twenty-three counts of civil violations of the Controlled Substances

Act ("CSA"), 21 U.S.C. § 801 et. seq.[1] See Minute Entry (Doc. No. 126) ("Dr. Ahuja

admitted each of Counts 1–23."); Am. Compl. (Doc. No. 106) (alleging twenty-three

CSA violations). The plaintiff, the United States ("the Government"), asks the court to

assess civil penalties against Dr. Ahuja of $496,500,[2] see March 7, 2017 Hearing

Transcript ("Tr.") (Doc. No. 153) at 143, and asks the court to order Dr. Ahuja "to comply

with all federal laws and regulations pertaining to receipts, dispensations, and

---

[1] Because Dr. Ahuja admitted these violations, jury selection was cancelled.

[2] The Government first suggested this $496,500 figure in the context of its Motion for Default Judgment (Doc. No. 14). See Mot. for Default ¶ 10. The Government explained therein that the $496,500 figure was based on requesting the court impose $500 per violation for each of the 961 violations that carry a maximum penalty of $10,000, and $1,000 per violation for each of the sixteen violations that carry a maximum penalty of $25,000. See id. ¶ 10. The court explains the number of violations and maximum penalties below. See infra Section V(A)(1) (explaining that Counts One through Eighteen constitute 961 violations, each of which carry a maximum penalty of $10,000); V(A)(2) (explaining that Counts Nineteen through Twenty-Three constitute sixteen violations, each of which carry a maximum penalty of $25,000).

inventories of controlled substances" in the future, Am. Compl. at 8. Dr. Ahuja argues

that the amount of penalties should be $28,462.16. See Tr. at 155.

The court accepted written affidavits in lieu of direct testimony and held an

evidentiary hearing to hear cross-examination in order to then determine the amount of

penalties.[3]

For the reasons that follow, the court **ORDERS** Dr. Ahuja to pay $200,000 and to

comply with all federal laws and regulations pertaining to receipts, dispensations, and

inventories of controlled substances in the future.

## II.    ADMITTED VIOLATIONS

Dr. Ahuja is a practitioner registered with the Drug Enforcement Administration

and authorized to handle controlled substances. See Am. Compl. at 1. The counts, all

of which Dr. Ahuja admits, set forth the following violations:

Counts One through Eight set forth violations of section 842(a)(5) of title 21 of the

United States Code[4] and section 1304.04(a) of title 21 of the Code of Federal

Regulations,[5] based on failure to maintain controlled substance receipt records for (1)

---

[3] While a jury would typically determine liability for a civil CSA violation, once liability has been decided, the court itself may determine the penalty amount. See, e.g., Advance Pharmaceutical v. United States, 391 F.3d 377, 389 (2d Cir. 2004) (describing case in which, after jury found liability, court held hearing to determine penalty); United States v. Bizga, No. 1:13-CV-206, 2014 WL 11370407, at *1 (N.D. Ohio Apr. 8, 2014) ("The parties stipulated to [the defendant]'s liability for violations of the CSA and accompanying regulations, and agreed that the Court would determine the civil penalties to be assessed, if any, following a hearing."); United States v. Paskon, No. 4:07-CV-1161 (CEJ), 2008 WL 4948458, at *1 (E.D. Mo. Nov. 10, 2008) ("This matter is before the Court for determination of damages, penalties, and injunctive relief following the jury's verdict on the claims brought by the United States pursuant to . . . the Controlled Substances Act."); United States v. Salcedo, No. 02-CV-1095 (FB) (VVP), 2003 WL 21196843, at *1 (E.D.N.Y. Feb. 19, 2003) (stating that, after "default judgment against defendant," court referred matter to magistrate "for determination of the relief to be granted plaintiff"). The parties agreed that the amount of the penalty is for the court to determine.

[4] Section 842(a)(5) makes it unlawful "to refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under" the CSA. 21 U.S.C. § 842(a)(5).

[5] Section 1304.04(a) requires the keeping of certain records. See 21 C.F.R. § 1304.04(a).

seventeen shipments of Alprazolam, <u>see</u> Am. Compl. Count I, (2) eight shipments of Hydrocodone Bitartrate with Acetaminophen, <u>see</u> <u>id.</u> Count II, (3) seven shipments of Guaifenesin with Codeine Phosphate, <u>see</u> <u>id.</u> Count III, (4) one shipment of Testosterone Cypionate, <u>see</u> <u>id.</u> Count IV, (5) one shipment of Zolpidem Tartrate, <u>see</u> <u>id.</u> Count V, (6) ten shipments of 75-milligram Lyrica tablets, <u>see</u> <u>id.</u> Count VI, (7) eight shipments of 50-milligram Lyrica tablets, <u>see</u> <u>id.</u> Count VII, and (8) one partially-used vial of Depo-Testosterone, <u>see</u> <u>id.</u> Count VIII.

Count Nine sets forth a violation of section 1304.04(f)(2) of title 21 of the Code of Federal Regulations[6] for failure to separate controlled substance records for Schedule III, IV, and V substances from records for non-controlled substances. <u>See</u> Am. Compl. Count IX.

Count Ten sets forth a violation of section 827(a)(1) of title 21 of the United States Code[7] and section 1304.11(c) of title 21 of the Code of Federal Regulations[8] based on failure "to perform and maintain a biennial inventory of controlled substances." Am. Compl. Count X.

Counts Eleven and Twelve set forth violations of section 827(a)(3) of title 21 of

---

[6] Section 1304.04(f)(2) states that "[i]nventories and records of controlled substances listed in Schedules III, IV, and V shall be maintained either separately from all other records of the registrant or in such form that the information required is readily retrievable from the ordinary business records of the registrant." 21 C.F.R. § 1304.04(f)(2).

[7] Section 827(a)(1) requires a "complete and accurate record of all stocks [of controlled substances] on hand." 21 U.S.C. § 827(a)(1).

[8] Section 1304.11(c) requires a "biennial inventory." 21 C.F.R. § 1304.11(c).

the United States Code,[9] and either section 1304.21(a)[10] or 1304.22(c)[11] of title 21 of the Code of Federal Regulations, for failures (11) "to maintain accurate dispensing records for" Alprazolam, resulting in failure to account for 59 bottles, Am. Compl. Count XI, and (12) to properly complete a dispensation log for 517 bottles of this drug, see id. Count XII.

Counts Thirteen and Fourteen set forth violations of section 827(a)(3), and either section 1304.21(a) or 1304.22(c), for failures (13) "to maintain accurate dispensing records for" Hydrocodone Bitartrate with Acetaminophen, resulting in failure to account for 21 bottles, Am. Compl. Count XIII, and (14) to properly complete a dispensation log for 92 bottles of this drug, see id. Count XIV.

Counts Fifteen and Sixteen set forth violations of section 827(a)(3), and either section 1304.21(a) or 1304.22(c), for failures (15) "to maintain accurate dispensing records for" Guaifenesin with Codeine Phosphate, resulting in failure to account for 58 bottles, Am. Compl. Count XV and (16) to properly complete dispensation logs for 154 bottles of this drug, see id. Count XVI.

Counts Seventeen and Eighteen set forth violations of section 827(a)(3) and section 1304.21(a) for failure "to maintain accurate dispensing records for" (17) Testosterone Cypionate, resulting in failure to account for two vials, Am. Compl. Count

---

[9] Section 827(a)(3) requires "a complete and accurate record of each such substance manufactured, received, sold, delivered, or otherwise disposed of." 21 U.S.C. § 827(a)(3).

[10] Section 1304.21(a) requires "a complete and accurate record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of." 21 C.F.R. § 1304.21(a).

[11] Section 1304.22(c) requires records "of the number of units or volume of [controlled substances in] finished form dispensed, including the name and address of the person to whom it was dispensed, the date of dispensing, the number of units or volume dispensed, and the written or typewritten name or initials of the individual who dispensed or administered the substance on behalf of the dispenser." 21 C.F.R. 1304.22(c).

4

XVII, and (18) Zolpidem Tartrate, resulting in failure to account for three bottles, id. Count XVIII.

Counts Nineteen and Twenty set forth violations of sections 842(a)(1)[12] and 842(c)(1)(A)[13] of title 21 of the United States Code, and section 1306.04(a) of title 21 of the Code of Federal Regulations,[14] for dispensing "controlled substances outside of the usual course of [Dr. Ahuja's] professional practice," namely, (19) to Dr. Ahuja's ex-wife, Gurpreet Ahuja ("Gurpreet"), either Hydrocodone with Acetaminophen, or Alprazolam, on a total of four different occasions, Am. Compl. Count XIX; see also Dr. Ahuja Aff. (Def. Ex. A) ¶ 7(l) (clarifying that "Jane Doe #1," referred to in this Count, is Gurpreet), and (20) to his son, Sunny Ahuja, Guaifenesin with Codeine, on two different occasions, id. Count XX; see also Sunny Ahuja ("Sunny") Aff. (Def. Ex. C) ¶ 5 (clarifying that "John Doe #1," referred to in this Count, is Sunny).

Counts Twenty-One and Twenty-Two set forth violations of sections 842(a)(1)

---

[12] Section 842(a)(1) makes it unlawful for a registrant "to distribute or dispense a controlled substance in violation of section 829 of [ ] title [21 of the United States Code]." 21 U.S.C. § 842(a)(1).

While the Amended Complaint incorrectly lists section 842(a)(2) in these counts, the Government clarified via email to the court on March 3rd, 2017, with copy to defense counsel, that the Government meant to list section 842(a)(1).

[13] Section 842(c)(1)(A) states that "any person who violates" section 842(a)(1), "shall, with respect to any such violation, be subject to a civil penalty of not more than $25,000." 21 U.S.C. § 842(c)(1)(A).

While the Amended Complaint incorrectly lists section 841(a)(1) in these counts, the Government clarified in the same email that the Government meant to list section 842(c)(1)(A).

[14] Section 1306.04(a) requires that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. 1306.04(a).

While the Amended Complaint incorrectly lists section 1306.21(b) in these counts, the Government clarified via email to the court that the Government meant to list section 1306.04(a).

and 842(c)(1)(A),[15] and section 1306.04(a) of title 21 of the Code of Federal Regulations, for prescribing "controlled substances outside of the usual course of [Dr. Ahuja's] professional practice," namely, (21) to his son, Nicholas Ahuja ("Nicholas"), Zolpidem, on five different occasions, Am. Compl. Count XXI; <u>see also</u> Nicholas Aff. (Def. Ex. B) ¶ 5 (clarifying that "John Doe #2" listed in this Count is Nicholas), and (22) to his brother, Uttam Ahuja ("Uttam"), either Cheratussin AC, Hydrocodone Bitartrate, or Hydrocodone Chlorpheniramine, on a total of three different occasions, <u>id.</u> Count XXII; <u>see also</u> Uttam Aff. (Def. Ex. D) ¶ 5 (clarifying that "John Doe #3" listed in this Count is Uttam).

Count Twenty-Three sets forth violations of section 842(a)(1) and 842(c)(1)(A) of title 21 of the United States Code[16] for illegal possession of two (full or partial) bottles of Alprazolam which had previously been dispensed to Nicholas or Uttam. <u>See</u> Am. Compl. Count XXIII.

## III. LEGAL STANDARD

Maximum penalties for the various violations of law by Dr. Ahuja are set out in the statutes. "[A]ny person who violates" section 842(a)(1), "shall, with respect to any such violation, be subject to a civil penalty of not more than $25,000." 21 U.S.C. § 842(c)(1)(A). "In the case of a violation of" section 842(a)(5), "the civil penalty shall not exceed $10,000." 21 U.S.C. § 842(c)(1)(B).

The parties agree that the Second Circuit's decision in <u>Advance Pharmaceutical,</u>

---

[15] Again, while the Amended Complaint incorrectly lists sections 841(a)(1) and 842(a)(2) in these counts, the Government clarified via email to the court that the Government meant to list sections 842(a)(1) and 842(c)(1)(A).

[16] While the Amended Complaint incorrectly lists section 841(a)(1) in Count Twenty-Three, the Government clarified during the hearing that the Government meant to list section 842(a)(1) and 842(c)(1)(A) here, as well. <u>See</u> Tr. at 3.

<u>Inc. v. United States</u>, 391 F. 3d 377 (2d Cir. 2004), provides the standard for

determining the size of a reasonable penalty. <u>See</u> Pl.'s Mem. (Doc. No. 134) at 1;

Def.'s Mem. (Doc. No. 135) at 1. According to <u>Advance Pharmaceutical</u>, a

> district court may properly consider a number of factors in
> determining the size of a civil penalty, including the good or
> bad faith of the defendants, the injury to the public, and the
> defendant['s] ability to pay. Thus, in determining monetary
> penalties under § 842(c), district courts have frequently
> considered four factors: (1) the level of defendant's culpability,
> (2) the public harm caused by the violations, (3) defendant's
> profits from the violations, and (4) defendant's ability to pay a
> penalty.

391 F.3d at 399 (internal quotation marks and citation omitted); Pl.'s Mem. at 1–2; Def.'s

Mem. at 1–2.

## IV. FINDINGS OF FACT

### A. <u>Culpability</u>

The court finds that Dr. Ahuja engaged in the following conduct, or lack of

conduct: (1) Dr. Ahuja dispensed controlled substances directly from his practice,

despite the fact that most physicians choose instead to only "write prescriptions" and

have "pharmacies dispense the medicines," <u>see, e.g.</u>, Marcie L. Johnson ("Johnson")

Aff. (Gov. Ex. 39) ¶ 14, (2) Dr. Ahuja prescribed controlled substances to family

members, <u>see, e.g.</u>, <u>id.</u> ¶ 11; Dr. Ahuja Aff. ¶ 7(l), (3) Dr. Ahuja failed to make proper

notations in family members' patient charts when prescribing controlled substances to

them, <u>see, e.g.</u>, Tr. at 61–62, (4) Dr. Ahuja failed to properly record dispensations in

his dispensation log, <u>see</u> Dr. Ahuja Aff. ¶ 7(e),(g),(i), (5) Dr. Ahuja failed to conduct a

biennial inventory of the controlled substances he had on hand, for three to four years

in a row, <u>see</u> Am. Compl. Count X; Johnson Aff. ¶ 28; Dr. Ahuja Aff. ¶ 7(d); Tr. at 112;

and, as a result of this failure to conduct a biennial inventory, Dr. Ahuja lacked a

method of noting whether controlled substances had gone missing, <u>see</u> Tr. at 112, (6) Dr. Ahuja cannot account for certain medications, <u>see, e.g.</u>, Dr. Ahuja Aff. ¶ 7(d),(f),(h),(j),(m),(k), (7) Dr. Ahuja consistently failed to upload information to the Connecticut Prescription Monitoring and Reporting System (CPMRS) regarding his dispensations of controlled substances to patients, thus preventing other doctors from knowing whether their patients may have been receiving controlled substances from more than one source, <u>see</u> Rodrick J. Marriott ("Marriott") Aff. (Gov. Ex. 37) ¶ 8; Tr. at 103, and, (8) if Dr. Ahuja's own theory were to be credited (which it is not),[17] due to his insufficient security measures and failure to properly keep track of his medication, Dr. Ahuja allowed controlled substances to be stolen by his former secretary, who presumably used the substances for an illicit purpose; and Dr. Ahuja then failed to report this diversion to law enforcement officials, <u>see</u> Tr. at 95–96, 110–12, 115–16, 121–23.

The court credits and agrees with the opinion of University of Connecticut School of Medicine Assistant Clinical Professor in Family Medicine, Dr. Adam Perrin, M.D. ("Dr. Perrin"), that Dr. Ahuja's behavior reflects "a blatant disregard for the rigor and careful oversight required for the safe and proper dispensing and prescribing of controlled

---

[17] Dr. Ahuja's testimony and demeanor at the evidentiary hearing leads the court to discredit most of his testimony. For instance, while Dr. Ahuja had admitted liability on all counts of the Amended Complaint at a prior court proceeding, Dr. Ahuja stated during the evidentiary hearing that he had only admitted liability to "most" of the Amended Complaint, and did not admit liability on every count. <u>See</u> Tr. at 88–89. Dr. Ahuja later acknowledged that he had in fact admitted liability to the entire Amended Complaint. <u>See id.</u> at 90–91. He then stated that he wished to withdraw a portion of his admission of liability. <u>See id.</u> at 113. During this same March 7, 2017 evidentiary hearing, and in connection with changing his mind about the extent of his prior admission of liability, Dr. Ahuja renounced a portion of the Affidavit that Dr. Ahuja had signed only six days previously—on March 1st, 2017. <u>See id.</u> at 89–90, 113. Dr. Ahuja had sworn to the accuracy of his Affidavit at the evidentiary hearing, only moments before renouncing a portion of it. <u>See id.</u> at 85. During the hearing, Dr. Ahuja gave several other contradictory answers as well.

substances." Dr. Perrin Expert Report at 8.  While Dr. Ahuja testified that he "was

making an attempt to keep the required records," Dr. Ahuja Aff. ¶ 7, the court views

those efforts as essentially non-existent.

     B.   <u>Public Harm</u>

     The court finds that, with regard to Dr. Ahuja's family members who were given

controlled substances, (1) the medications were given to treat bona fide illnesses, (2)

Dr. Ahuja checked up with them regarding the medications and the illnesses, and (3)

the medications were effective.  <u>See</u> Nicholas Aff. ¶ 5, Sunny Ahuja Aff. ¶ 5, Uttam Aff.

¶ 6.

     However, the court finds that approximately $28,500 worth of drugs were

diverted for non-medical purposes due to Dr. Ahuja's violations.  Dr. Ahuja—in an

apparent attempt to buttress his argument that he had not taken drugs from his own

supply—presented a theory that his former secretary had stolen the missing

medications from him, under circumstances that lead to the conclusion that the

secretary would have used or sold the drugs for non-medical purposes.  <u>See</u> Tr. at 95–

96; <u>see also</u> Tr. at 111 (clarifying that Dr. Ahuja believes the secretary took all his

missing medication).  According to DEA Diversion Group Supervisor Leonard Levin

("Levin"), the total street value for all the unaccounted-for medications is $28,462.18.

<u>See</u> Levin Aff. ¶ 27.  The court notes that, if Dr. Ahuja invented his theory about the

secretary stealing his drugs to deflect attention from his own malfeasance, the court can

only assume that the truth is something worse than the secretary stealing the drugs—

such as Dr. Ahuja directly diverting this $28,500 worth of controlled substances by

consuming them himself or distributing them for non-medical purposes at a price of $4

per Alprazolam pill, $7 per Hydrocodone pill, $13.50 per bottle of Guaifenesin with Codeine, $84.89 per vial of Testosterone Cypionate, and $20.67 per bottle of Zolpidem tartrate. See id. ¶¶ 25–26.

The court finds, as Johnson testified, that "[t]he failure to report" the dispensation of controlled substances,

> allows for the diversion of controlled substances. Specifically, the patient can be seeing another provider and the other provider would have no way of knowing that the patient is also receiving controlled substances from Dr. Ahuja. This exposes the patient and, if the patient is not personally using the controlled substances, the community, to harm.

Johnson Aff. ¶ 63. The court further finds, based on Dr. Perrin's testimony, that, for a practitioner to have "controlled substances on site" involves an "inherent risk of theft and misuse," which "calls for strict policy and procedure in establishing a protocol to insure security, proper handling and appropriate dispensing practices." Dr. Perrin Expert Report at 8. By failing to exercise proper vigilance, the court finds that Dr. Ahuja created a volatile situation that put his patients and family members at risk of harm from improper use of addictive substances. Id. at 8; see also Dr. Ahuja Aff. ¶ 11 (stating that Dr. Ahuja does "not dispute that wide spread abuse of controlled substances has reached crisis levels in the United States at this time").

C. Profit

The court finds that Dr. Ahuja can be expected to have made a profit of approximately $3,000 from his CSA violations. As detailed below, this profit estimation is based on the estimated retail value of the unaccounted-for drugs, subtracting the estimated cost Dr. Ahuja paid to buy these drugs. In making a profit finding, the court was required to decide between counting either (1) the retail value of the missing drugs,

or (2) their street value. In deciding to use the retail value, the court does not simply rely on Dr. Ahuja's testimony that he sold the drugs at their retail value, <u>see</u> Dr. Ahuja Aff. ¶ 10, because the court does not find Dr. Ahuja to be credible. However, the Government has presented no evidence that Dr. Ahuja operated his medical office as a "pill factory" or "pill mill," meaning an illegal prescription drug dealing business disguised as a medical office, that exists solely to distribute controlled substances. <u>See, e.g.</u>, <u>United States v. Duprey</u>, 652 F. App'x 107, 108–09 (3d Cir. 2016) (describing as "pill factory" doctor's office where numerous pseudo-patients received weekly, highly uniform, controlled substance prescriptions, for the purpose of giving their pills to the doctor's co-conspirator; and affirming conviction of co-conspirator, who drove pseudo-patients to the doctor's office and to the pharmacist—another co-conspirator—before collecting pills from pseudo-patients and reselling them); <u>United States v. Guzman</u>, 571 F. App'x 356, 357–58, 360 (6th Cir. 2014) (agreeing that use of term "pill mill" accurately described allegations, and affirming conviction, where defendant ran a purported pain management clinic, which "bore all the hallmarks of an illegal operation," such as an unusually high amount of customer traffic—including customers from several other states, and customers who arrived in large groups all to receive the same type of prescription—, drug deals occurring in the parking lot, customers lingering in cars outside the clinic in a semi-conscious state, people "sponsor[ing]" customers to buy drugs for them, "skyrocket[ting]" prescription drug use in the county after the business opened, an emphasis on speed rather than careful patient examinations, a refusal to accept insurance coupled with an unusually large amount of business done in cash, the fact that patients generally had no obvious symptoms, and the fact that patients often

requested specific forms of drugs—such as drugs with particular markings).  The Government has not argued that Dr. Ahuja's medical office was run as a pill factory or pill mill, and it has presented no evidence from which the court could infer that Dr. Ahuja's business was run in this way.  For instance, the Government has presented no evidence (1) that every patient received controlled substances, rather than at least some patients receiving medical care that did not involve controlled substances, (2) that patients resold their drugs, (3) that the clinic had an unusually high number of patients, or attracted patients in large groups, or from surprisingly far away, (4) that the clinic failed to properly examine patients, or (5) that the patients lacked legitimate medical needs.  In the absence of such evidence, the court concludes that it would be speculative to assume that Dr. Ahuja ran his business as a pill factory.  Because the Government bears the burden of proof, see, e.g., Advance Pharmaceutical, 391 F.3d at 391, the court defaults to the assumption that Dr. Ahuja ran his business as a legitimate medical operation, and thus that he sold medications at their retail value, rather than at their street value.[18]

Dr. Ahuja claims that any profits he "obtained through the dispensing of controlled substances have been negligible."  Dr. Ahuja Aff. ¶ 10.  Dr. Ahuja asserts that he generally dispensed each 90-milligram bottle of Alprazolam for $30, which he says is the retail value.  See Dr. Ahuja Aff. ¶ 10.  Based on Dr. Ahuja's numbers, the cost to a patient for one pill of Alprazolam is $0.33.  The Government has not presented

---

[18] The court emphasizes that this conclusion does not excuse the egregiousness of Dr. Ahuja's reckless failure to take precautions to protect against the dangers of prescription drugs.

And Dr. Ahuja's failure to keep records impeded the Government's ability to determine how much profit Dr. Ahuja made from unlawfully dispensing controlled substances.

alternative evidence of the retail value of Alprazolam.  See Levin Aff. ¶¶ 25–26.

However, Levin calculates that the street value of one pill is approximately $4.  See id. ¶

25.  A large discrepancy exists between Dr. Ahuja's description of the retail value, and

Levin's description of the street value.  As discussed above, because the Government

bears the burden of proof, and because there is no evidence that Dr. Ahuja, if he sold

the missing medications, sold them for the higher street value, rather than the lower

retail value, the court considers the retail value to be the relevant price.  Dr. Ahuja

states that each bottle of Alprazolam cost him approximately $10.  See Dr. Ahuja Aff. ¶

10.  The Government has not offered any evidence to the contrary.  See Levin Aff. ¶ 25.

Based on Dr. Ahuja's figures, he thus generally made a profit of approximately $20 per

bottle.  In the absence of contrary evidence regarding the retail value of Alprazolam or

the price Dr. Ahuja paid for Alprazolam, the court finds that Dr. Ahuja made a profit of

approximately $20 per bottle of Alprazolam sold.  Dr. Ahuja failed to account for 59

bottles of Alprazolam.  See Am. Compl. Count XI.  Dr. Ahuja thus would have made a

profit of approximately $1,180 by dispensing the unaccounted-for Alprazolam.

Dr. Ahuja states that he dispensed a 30-tablet bottle of Hydrocodone for

approximately $30, which he says is the retail value.  See Dr. Ahuja Aff. ¶ 10.  The court

again considers the retail value to be the relevant consideration.  Again, the

Government has not presented any contrary evidence as to the retail value of

Hydrocodone.  See Levin Aff. ¶¶ 25–26.  Dr. Ahuja states that each bottle cost him

approximately $10, thus indicating that he generally made a profit of approximately $20

per bottle.  See Dr. Ahuja Aff. ¶ 10.  The Government has not presented any evidence

to the contrary.  See Levin Aff. ¶ 25.  Dr. Ahuja failed to account for 21 bottles of

Hydrocodone.  <u>See</u> Am. Compl. Count XIII.  Dr. Ahuja thus would have made a profit of approximately $420 by dispensing the unaccounted-for Hydrocodone.

Dr. Ahuja states that he dispensed a four-ounce bottle of Guaifenesin with Codeine for approximately $10, which he says is the retail value.  <u>See</u> Dr. Ahuja Aff. ¶ 10.  However, Levin states that the retail value of a bottle of Guaifenesin with Codeine is $13.50.  <u>See</u> Levin Aff. ¶ 26.  The court finds Levin to be more credible than Dr. Ahuja.  Furthermore, Dr. Ahuja states that Guaifenesin with Codeine cost him approximately $10 to buy, <u>see</u> Dr. Ahuja Aff. ¶ 10, and Levin does not dispute this cost, <u>see</u> Levin Aff. ¶ 26.  The court finds that, if Dr. Ahuja sold the unaccounted-for Guaifenesin with Codeine, he would have sold it for approximately $13.50 per bottle, making a profit of approximately $3.50 per bottle.  Dr. Ahuja failed to account for 58 bottles of Guaifenesin with Codeine.  <u>See</u> Am. Compl. Count XV.  Dr. Ahuja thus would have made a profit of approximately $203 by dispensing the unaccounted-for Guaifenesin with Codeine.

Dr. Ahuja did not testify as to how much he typically charged clients for, or how much he himself paid for, Testosterone Cypionate or Zolpidem Tartrate.  <u>See</u> Dr. Ahuja Aff.  The court adopts Levin's estimates of the suggested retail value of these drugs.  Levin estimates that the retail value of all the unaccounted-for Testosterone Cypionate was $169.18, and that the retail value of all the unaccounted-for Zolpidem Tartrate was $1,860.  <u>See</u> Levin Aff. ¶ 26.  Assuming that Dr. Ahuja would have had to pay roughly one-third the retail cost in order to buy these drugs himself, the court estimates that Dr. Ahuja could have made a profit of approximately $112.79 from the unaccounted-for Testosterone Cypionate and $1,240 from the unaccounted-for Zolpidem Tartrate.

The total profit Dr. Ahuja would have made by "legitimately" dispensing the

unaccounted-for drugs is approximately $3,150. The court concludes that this $3,150 figure is the appropriate amount of profit to consider in applying the <u>Advance Pharmaceutical</u> standard. In adopting this profit figure, the court acknowledges that this figure is necessarily an estimation, as neither party has presented <u>definitive</u> evidence that the profit Dr. Ahuja made from his violations is in fact a function of the retail value of the unaccounted-for drugs, minus the price Dr. Ahuja paid for the drugs. For instance, the court lacks evidence that Dr. Ahuja in fact sold all the unaccounted-for drugs at their retail value and did not give any away for free, sell any for less than retail value, consume any himself or, as Dr. Ahuja suggests, have any stolen from him. In these scenarios, Dr. Ahuja would have made less than the above-estimated profit from the unaccounted-for drugs. Similarly, the court lacks conclusive evidence that Dr. Ahuja sold the unaccounted-for drugs for <u>only</u> their retail value and did not sell them for a higher street price, to individuals who did not have a medical need.[19] In this scenario, Dr. Ahuja would have made much more than the above-estimated profit from the unaccounted-for drugs. However, in the absence of evidence supporting either that Dr. Ahuja's profit was less than the retail value minus the price he paid, or that his profit was more than this figure, it is most reasonable to estimate that Dr. Ahuja's profit from his violations was the retail value of the unaccounted-for drugs minus the price he paid for them.

     D.    <u>Ability to Pay</u>

The court finds that Dr. Ahuja's annual adjusted gross income can be expected

---

[19] Dr. Ahuja did not keep, or did not produce to the court, medical records or other notes regarding his dispensing of the missing medications.

to be about $200,000 per year in the coming years, for the reasons that follow.

Dr. Ahuja's 2015 Individual Income Tax Return reflects an adjusted gross income of $155,705. See U.S. Individual Tax Return, 2015 (Def. Ex. EE) at 1; Stefan Peleschuk ("Peleschuk") Aff. (Def. Ex. E) ¶ 6. However, his 2014 Individual Income Tax Return reflects an adjusted gross income of $239,692. See U.S. Individual Tax Return, 2014 (Def. Ex. DD) at 1; Peleschuk Aff. ¶ 7. The court does not credit Dr. Ahuja's insistence that this 2014 income will not be representative of his income going forward, due to Dr. Ahuja's general lack of credibility, as well as the fact that Dr. Ahuja gave two different explanations to the court for why his 2014 income should be considered an aberration. Compare Dr. Ahuja Aff. at 10 ¶ 13 (stating that his 2014 income was an aberration because his ex-wife became too disabled to work, and so he temporarily took over her responsibilities at Darien Immediate Medical Center and received additional compensation for doing so, before passing those responsibilities on to Nicholas); with Tr. at 119–20 (stating that his 2014 income was an aberration because he sold some property that year, and also because his ex-wife allowed him to take more money from Darien Immediate Medical Center that year to help him pay certain legal expenses, with the understanding that she would take extra money in the future). However, the court does acknowledge that Dr. Ahuja's income in 2014 was higher than in the 2015 and in 2013. Dr. Ahuja's 2013 Individual Income Tax Return reflects an adjusted gross income of $215,037. See U.S. Individual Tax Return, 2013 (Def. Ex. CC) at 1; Peleschuk Aff. ¶ 8. Taking an average of these three amounts, the court concludes that Dr. Ahuja's annual adjusted gross income can be expected to be approximately $200,000 per year.

Dr. Ahuja, who is sixty-three years old, testified that a variety of health problems,

such as high blood pressure, depression, acid reflux, and poor hearing, "threaten to impact" his "ability to practice medicine in the imminent future." Dr. Ahuja Aff. at 11 ¶ 12. However, in the absence of any evidence as to his health demonstrating that Dr. Ahuja will likely have to stop practicing medicine in the imminent future, the court does not rely on Dr. Ahuja's self-serving speculation. He is still practicing, and even testified that he increased his work load when his ex-wife stopped working. See id. at 10 ¶ 13. The court finds that Dr. Ahuja has not provided credible evidence that he will be unable to continue working in the immediate future.

The court is unable to make a definitive finding as to the full extent of Dr. Ahuja's assets, due to Dr. Ahuja's failure to provide certain information. See Provost v. City of Newburgh, 262 F.3d 146, 163 (2d Cir. 2001) ("The duty [ ] is on the defendant to present evidence . . . of his limited resources if he wishes that factor to be weighed in the calculation of punitive damages."); see also Fowler v. California Highway Patrol, No. 13-CV-01026 (TEH), 2014 WL 3965027, at *6 (N.D. Cal. Aug. 13, 2014) (in imposing costs on plaintiff, disregarding plaintiff's argument "that her financial resources are scarce," because "she presents no admissible evidence supporting that she has limited financial resources"); Lazy Oil Co. v. Wotco Corp., 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997) (in class action settlement context, where sole evidence offered as to defendant's ability to pay larger judgment had "little bearing" on the issue, presuming that defendants "have the financial resources to pay a larger judgment"). The court does not put much weight in Dr. Ahuja's assertion that he has "virtually no financial assets." Id. at 9 ¶ 12. First, the court notes that, while Dr. Ahuja testified that he owns "no real estate, except for" his "1% share in the assets of Ahuja Holdings, LLC," Dr. Ahuja does not

state in his Affidavit the value of any other property he owns, such as stocks.  See Dr. Ahuja Aff. at 9–10 ¶ 12.  Dr. Ahuja did not state in his Affidavit or at the hearing that he owns no stocks or other such property.  See id. ¶ 12; Tr. at 108–10, 118–21.  Dr. Ahuja's accountant, Peleschuk, and Dr. Ahuja, both indicated that Dr. Ahuja at times has owned stocks.  See Peleschuk Aff. ¶ 6, 8 ("He took losses from the stocks he owns in [2015] . . . He gained a profit of $65K in earnings from stocks that he owned in [2013]."); Tr. at 119, 166–67 (containing, first, testimony by Dr. Ahuja that, "I believe I sold some property," and, later, in response to this court's comment that "I heard testimony that he had sold real estate," a response by defense counsel that the earlier testimony containing the term "property" "was referring to stock").

While Dr. Ahuja did not mention cars in his Affidavit, see Dr. Ahuja Aff., Dr. Ahuja admitted on cross-examination that he owns both a BMW and a Mercedes, see Tr. at 107–08.  Dr. Ahuja states that he has "two IRA retirement accounts, each with an approximate value of $10,000.00," and "two bank accounts, one . . . with a present balance of approximately $1,500.00 and the other . . . with a present balance of approximately $4,000.00."  Dr. Ahuja Aff. at 10 ¶ 12.  The court notes that Dr. Ahuja has not stated whether he transferred funds away from himself in order to be able to make this statement to the court regarding the "present balance" of his bank accounts.  Id. at 10 ¶ 12.  Dr. Ahuja has been known to transfer a large quantity of real property away from himself in the past, see id. at 10 ¶ 12 (stating that Dr. Ahuja conveyed a 99% interest in a trust containing all the real estate he "acquired over the course of" his life to his son, Nicholas, in 2009), although there is no evidence before this court that Dr. Ahuja made those transfers for improper motives.

Due to the lack of convincing evidence that Dr. Ahuja will become unable to work in the immediate future, or that Dr. Ahuja has no assets, the court concludes on the record before it that Dr. Ahuja has significant earning capacity and some other financial resources.

## V. CONCLUSIONS OF LAW

### A. Number of Violations and Maximum Penalties

As described in more detail below, Dr. Ahuja has engaged in a substantial number of violations of subsections 842(a)(1) and 842(a)(5) of title 21 of the United States Code. The maximum combined penalty that Dr. Ahuja faces for these violations is $10,010,000.[20] At the hearing, and in a Motion for Default Judgment (Doc. No. 14), the Government asked the court to impose a $496,500 penalty. See Tr. at 143; Mot. for Default ¶ 10.

#### 1. Counts One through Eighteen

As detailed below, Counts One through Eighteen involve 961 violations, each of which carry a maximum penalty of $10,000.

The Amended Complaint sets forth in Counts One through Eight violations of section 842(a)(5), for failure to maintain controlled substance receipt records for various shipments. See Am. Compl. Counts I–VIII. The maximum penalty for a violation of

---

[20] In its original Complaint (Doc. No. 2), the Government asked the court to impose a total penalty of $10,010,000—the maximum penalty allowable. See Compl. at 7–8 (asking court to impose penalty of $9,610,000 for violations in Counts I through XVIII, and $400,000 for violations in Counts XIX through XXV). However, the Amended Complaint inexplicably asked the court to impose a total penalty of $10,015,000. See Am. Compl. at 7–8 (asking court to impose penalty of $9,640,000 for violations in Counts I through XVIII, and $375,000 for violations in Counts XIX through XXV). The Government did not explain in its Motion to Amend (Doc. No. 97) or Memorandum in Support of Motion to Amend (Doc. No. 97-1) that it was changing the requested penalty amount, nor why. To the contrary, the Government stated that it sought to make "technical and non-substantive amendments . . . to clarify the charges," and that Dr. Ahuja was "not materially impacted by the amendments to the complaint." Mem. in Supp. of Mot. to Am. at 1.

section 842(a)(5) is $10,000.  <u>See</u> 21 U.S.C. § 842(c)(1)(B).  Thus, the maximum penalty for each of the violations in these Counts is $10,000.  <u>See</u> 21 U.S.C. § 842(c)(1)(B); <u>see also</u> Am. Compl. at 7.  Absent evidence suggesting that multiple shipments represented a single purchase, <u>see</u> <u>United States v. Bizga</u>, No. 1:13-CV-206, 2014 WL 11370407, at *2 (N.D. Ohio Apr. 8, 2014) ("When assessing penalties for failure to record or report purchases of controlled substances, each purchase counts as a separate violation."), the court considers each shipment in these Counts to be a separate violation, <u>see</u> <u>United States v. Stidham</u>, 938 F. Supp. 808, 816 (S.D. Ala. 1996) ("[F]ailure to record the number and dates of the items received as to each of the seventeen shipments amounts to seventeen [ ] violations.").  Counts One through Eight involve fifty-three shipments.  <u>See</u> Am. Compl. Counts I–VIII.  Counts One through Eight thus involve fifty-three violations combined, and the maximum penalty for these counts, combined, is $530,000.

The Amended Complaint does not explicitly describe Counts Nine through Eighteen as section 842(a)(5) violations.[21]  <u>See</u> Am. Compl. Counts IX–XVIII.  However, each of Counts Nine through Eighteen describes conduct that violates section 842(a)(5), which makes it unlawful to "refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or

---

[21] However, the Amended Complaint asked the court to enter "a civil penalty of $10,000 for each of the violations and occurrences set forth in" these Counts, citing section 842(c)(1) of title 21 of the United States Code.  Am. Compl. at 7.  Section 842(c)(1) lists this $10,000 figure as the penalty for a violation of section 842(a)(5).  <u>See</u> 21 U.S.C. § 842(c)(1)(B).

information required under" the CSA.  21 U.S.C. § 842(a)(5).[22]  Thus, the maximum penalty for each of the violations in Counts Nine through Eighteen is $10,000 per violation.

The court treats Count Nine and Count Ten as each involving a single violation, because each of these two Counts allege an overall failure to create or keep one type of record.  Counts Nine and Ten thus involve a total of two CSA violations, and the maximum penalty for these two Counts combined is $20,000.

As for Counts Eleven through Eighteen, the court treats each individual dispensation as a separate violation.  See United States v. Paskon, No. 4:07-CV-1161 (CEJ), 2008 WL 4948458, at *2 (E.D. Mo. Nov. 10, 2008) (treating one unlawful prescription as one violation); United States v. Salcedo, No. 02-CV-1095 (FB) (VVP), 2003 WL 21196843, at *2 (E.D.N.Y. Feb. 19, 2003) ("The issuance of each of the [ ] prescriptions constituted a separate violation."); United States v. Akhtar, 95 F. Supp. 2d 668, 669, 673 (S.D. Tex. 1999) (treating four unlawful sales as "four violations"). However, because Dr. Ahuja did not maintain accurate dispensing records or properly complete dispensation logs, see Am. Compl. Count XI–XVIII, the court does not know how many drugs were dispensed at one time in Counts Eleven through Eighteen, and thus does not know how many separate dispensations are represented by these counts. Where "the defendant's own failure to keep any records makes it impossible to

---

[22] Count Nine, which is failure to keep separate records for certain controlled substances, see Am. Compl. Count IX; Count Ten, which is failure "to perform and maintain a biennial inventory of controlled substances," Am. Compl. Count X; and Counts Eleven through Eighteen, which are either failures to maintain accurate dispensing records or failures to properly complete dispensation logs, see Am. Compl. Count XI–XVIII, all constitute failures "to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required," 21 U.S.C. § 842(a)(5).

determine [the] number of violations," a court in the Northern District of Ohio decided it was "fair that all inferences be drawn against defendant and that the Court assume the worst-case scenario" with regard to the number of violations. United States v. Heim, No. 5:13-CV-210, 2014 WL 245357, at *5 (N.D. Ohio Jan. 22, 2014).[23]  Here, Counts Eleven through Eighteen involved 141 bottles and 2 vials of drugs unaccounted for, and 763 bottles of drugs dispensed without proper logging. See Am. Compl. Counts XI–XVIII.  The court thus treats Counts Eleven through Eighteen as 906 violations.  The maximum penalty for Counts Eleven through Eighteen combined is $9,060,000.  The court thus finds that the maximum penalty for all violations in Counts One through Eighteen is $9,610,000.

### 2.    Counts Nineteen through Twenty-Three

Counts Nineteen through Twenty-Three allege violations of section 842(a)(1). The maximum penalty for the violations in each of these Counts is $25,000. See 21 U.S.C. § 842(c)(1)(A); see also Am. Compl. at 7–8.  Counts Nineteen through Twenty-Three involved four dispensations to Gurpreet, see Am. Compl. Count XIX; two dispensations to Sunny, see id. Count XX; five prescriptions to Nicholas, see id. Count XXI; three prescriptions to Uttam, see id. Count XXII; and two dispensations to either Nicholas or Uttam, see id. Count XXIII.  The court thus treats Counts Nineteen through Twenty-Three as sixteen CSA violations.  The court thus finds that the maximum penalty for all the violations in Counts Nineteen through Twenty-Three combined is

---

[23] Heim treated each individual tablet as a separate violation, for a total of 11,500 violations, in light of the facts of the particular case.  2014 WL 245357 at *5.  The court finds that, to charge Dr. Ahuja with a separate violation for every individual pill involved in his violations would be excessive here, but accepts the general principal that uncertainty resulting from Dr. Ahuja's failure to keep records should lead to assumptions in the Government's favor.  The court thus treats each bottle or vial in these Counts as a separate violation.

$400,000.

    B.   <u>Culpability</u>

Culpability can be conceptualized as the "good or bad faith of the defendant[ ]," <u>see</u> <u>Advance Pharmaceutical</u>, 391 F.3d at 400 (internal quotation marks omitted), "the willfulness of the violations," <u>United States v. Queen Village Pharmacy</u>, 1990 WL 165907 at *2, or whether the unlawful acts were "deliberate," <u>id.</u> at *3.

The number of violations and the length of time involved affects the determination of culpability. "[T]he level of culpability of the defendant" was found "to be relatively high in view of the numerous repeated violations of the [Controlled Substances] Act over an extended period of time." <u>United States v. Salcedo</u>, No. 02-CV-1095 (FB) (VVP), 2003 WL 21196843, at *2 (E.D.N.Y. Feb. 19, 2003). The defendant in <u>Salcedo</u> had engaged in thirty-two violations over a span of one year and nine months. <u>See</u> <u>id.</u> at *2. Here, Dr. Ahuja has engaged in over 1,000 violations, spanning a three-year period from February 21, 2011, to February 21, 2014. <u>See</u> Am. Compl. Counts I–XXIII.

Even where the "raw number of unaccounted for [ ] tablets seems shockingly high," however, a court may "compare[ ]" that number "to the total number of tablets received" by the defendant, to determine the percentage of drugs unaccounted for. <u>Queen Village</u>, 1990 WL 165907 at *3. A lower percentage of drugs unaccounted for suggests less culpability. <u>See</u> <u>id.</u> at *3. Here, the unaccounted-for Alprazolam represented 9.83% of Dr. Ahuja's supply, <u>see</u> Am. Compl. Count XI; the unaccounted-for Hydrocodone Bitartrate with Acetaminophen represented 17.5% of his supply, <u>see</u> <u>id.</u> Count XIII; the unaccounted-for Guaifenesin with Codeine Phosphate represented

27.36% of his supply, see id. Count XV; the unaccounted-for Testosterone Cypionate represented 100% of his supply, see id. Count XVII; and the unaccounted-for Zolpidem Tartrate also represented 100% of his supply, see id. Count XVIII. These are significant percentages, a fact which weighs in favor of a stiff penalty.

On the other hand, in assessing a doctor's culpability for failure to keep biennial inventories, the fact that the doctor attempted to keep these inventories can weigh in his favor. See id. at *3. Dr. Ahuja claims that he attempted to keep records. See Dr. Ahuja Aff. ¶ 7. However, the court views his attempts as almost non-existent.

The court concludes that Dr. Ahuja's level of culpability is extremely high in this case. While Dr. Ahuja's culpability is not as high as that of a physician who intentionally sells controlled substances to drug addicts for non-medical uses, Dr. Ahuja's negligence is about as gross as the court can imagine. The admitted violations, and the evidence adduced, show that Dr. Ahuja engaged in behaviors which combine to demonstrate gross negligence, indeed recklessness, in dealing with controlled substances.

     C.   <u>Public Harm</u>

"[T]he public harm caused by the violations," also phrased as "the injury to the public," includes considerations such as the extent to which a doctor's actions "facilitate[ed] the diversion of" pharmaceuticals to improper uses. <u>Advance Pharmaceutical</u>, 391 F.3d at 399. Such a diversion to improper uses is especially problematic if the particular drug "would cause" a great deal of harm "in the illegal [drug] market," and if this diversion to improper users could have been largely prevented by the doctor following the law. <u>United States v. Global Distributors</u>, 498 F.3d 613, 620–21 (7th Cir. 2007). However, the mere fact that "prescription drug abuse" is "harmful to the

public" will not weigh in favor of a stricter penalty where there is no evidence that the doctor's improper behavior has played a role in such drug abuse.  See United States v. Butterbaugh, No. C14-515 (TSZ), 2015 WL 4660096, at *7 (W.D. Wash. Aug. 5, 2015). While the risk of prescription drug abuse is present here, as discussed above, the court does not find that Dr. Ahuja was running purely a "pill factory."  See, e.g., Duprey, 652 F. App'x at 108–09.  It appears that he ran a clinic with patients other than those requiring the medications in question.

The Government initially asserted that, "[i]n order to quantify the harm to the public, courts have permitted the United States to include [ ] an estimate of the United States' investigative costs."  Pl.'s Mem. at 3.  However, the Government's Memorandum does not cite any cases supportive of this assertion.  See id. at 3.  The court is aware of a Northern District of New York case that, in calculating a civil penalty for failure to comply with an Environmental Protection Agency information request, held that "[d]elaying [an] investigation . . . constitute[s] injury to the public."  United States v. Timmons Corp., No. CIV-103-CV-951 (RFT), 2006 WL 314457 at *16 (N.D.N.Y. Feb. 8, 2006).  The court does not consider Timmons to be on point, however.[24]  At a pre-hearing conference, the court asked the Government to support its assertion, and the Government asked for more time to do so.  However, the Government did not submit additional briefing on this topic.  At the hearing, Government counsel admitted that, "there is not a specific reference that I'm aware of that allows specifically investigative costs."  Tr. at 4.  The court thus does not consider the cost of the investigation in

_____

[24] In calculating a civil penalty for refusal to allow state officials on property, the Sixth Circuit listed "injury to the public" and "cost to the state of prosecuting," separately, United States v. Taylor, 8 F.3d 1074, 1078 (6th Cir. 1993), thus suggesting that at least the cost of prosecuting is excluded from the meaning of injury to the public, at least in that context.

assessing the public harm in this case.[25]

The Government also asserts that, "[i]n order to quantify the harm to the public, courts have permitted the United States to include . . . an estimate of the street value of the controlled substances in the illegal drug trade."  Pl.'s Mem. at 3.  This is true (1) where the evidence supports a finding that drugs were diverted to illegal uses, and (2) where, although the evidence is insufficient to support a finding that diversion occurred, there is nonetheless a significant <u>risk</u> that such a diversion may have occurred.

Where drugs are diverted to illegal uses, courts consider the street value of the drugs in determining an appropriate penalty.  For instance, the Seventh Circuit found that the fact that drugs were "converted into almost half a million dollars' worth of methamphetamine . . . cut[ ] in favor of a stiff penalty."  <u>Global Distributors</u>, 498 F.3d at 620–21 (internal quotation marks omitted).  Similarly, a court in the Eastern District of New York assessed a penalty for civil CSA violations which was calculated to match a high estimate of the approximate street value of all drugs prescribed in violation of the CSA.  <u>See</u> <u>Salcedo</u>, 2003 WL 21196843, at *2.  Specifically, where a doctor prescribed 3,200 tablets and a witness testified that "each tablet can be sold on the street for between $5 and $8," the court assessed a penalty of $25,600, calculated by multiplying the number of tablets by the higher estimate of eight dollars.  <u>Id.</u> at *2.  In <u>Salcedo</u>, while the court did not say so explicitly, the defendant presumably diverted the drugs to improper purposes:  "[T]he prescriptions were issued in the name of a patient who was not under the direct care of the defendant," and "the address listed by the defendant on

---

[25] While Dr. Ahuja's contradictory answers may not have been calculated to facilitate the investigation, the Government has failed to present evidence that Dr. Ahuja actually delayed the investigation, such as evidence that Dr. Ahuja caused investigators to spend time on false leads.

each prescription was not the proper address for the patient; the address listed was in Queens, New York, but the purported patient was living in the Philippines throughout the time when the prescriptions were written." Id. at *2. The court did not explicitly state that the doctor's prescribing of drugs in the name of a non-patient who lived outside of the country, coupled with the use of a false address, evidenced that the drugs were diverted. Id. at *2. However, the court implied that the defendant had likely sold the drugs on the street, by stating, after mentioning the street value, that the defendant "could have grossed as much as $25,600 from the sale" of the tablets. Id. at *2. Lastly, where drugs disappeared from pharmacies, a court in the District of Massachusetts assessed the "harm to the public" in part by discussing the street value of the missing drugs. United States v. Poulin, 926 F. Supp. 246, 254–55 (D. Mass. 1996). In Poulin, the drugs were "reported stolen." Id. at 249. Again, while the court did not explicitly state that the fact of the drugs being stolen supported a finding that they were diverted, the court implied that the stolen drugs were diverted, by stating that "[t]he disappearance of these drugs constitutes a serious public health risk," due to the danger of drug abuse. Id. at 254.

A court may also consider the street value of the drugs in determining an appropriate penalty where, although the evidence is insufficient to support a finding that diversion occurred, there is nonetheless a significant risk that such a diversion may have occurred. A court in the Northern District of Ohio found a "significant risk that [ ] tablets of hydrocodone"—which the court noted is "a highly abused and highly controlled substance"—were diverted to illegal channels and rendered untraceable. Bizga, 2014 WL 11370407, at *6. The court determined "that a fine which treble[d] the

street value of the[ ] drugs would certainly be reasonable for the recording violations relating to the dispensing of the[ ] tablets." Id. at *6 (nonetheless assessing lower penalty, due to insufficient ability to pay). However, a court in the Western District of Washington has refused to consider the street value of improperly-prescribed drugs in its assessment of harm to the public, where there was no evidence that the drugs were distributed or dispensed for non-medical purposes. Butterbaugh, 2015 WL 4660096, at *7.

Here, while there is insufficient evidence to find by a preponderance of the evidence that any drugs were in fact diverted or abused, the court concludes that there is a significant risk that such diversion may have occurred. For instance, if Dr. Ahuja is correct that his drugs were stolen, it is clear that they were distributed illegally.

In assessing harm to the public, courts also consider the dangerousness of the drugs involved in the CSA violations. As mentioned above, a court in the Northern District of Ohio considered the fact that Hydrocodone is "highly abused" in weighing the harm to the public. Bizga, 2014 WL 11370407, at *6. Similarly, a court in the District of Massachusetts assessed the "harm to the public" in part by discussing the fact that "the drugs that disappeared from the [ ] pharmacies are drugs with a very high abuse potential," and that the abuse of some of the missing drugs "can cause serious trauma and even death to abusers." Poulin, 926 F. Supp. at 254–55. "[H]ighly abused" Hydrocodone, Bizga, 2014 WL 11370407, at *6, is one of the drugs involved in the violations here. See Am. Compl. Counts II, XIII, XIX, XII. It does not require a citation to conclude that the illicit sale of controlled substances has enormous costs to individuals and society.

28

The court finds that the level of public harm weighs in favor of imposition of a severe penalty, because (1) Dr. Ahuja dispensed drugs that had a high potential for abuse, without any, let alone the requisite degree of, care to ensure that the drugs would not be misused, and (2) a risk of diversion of these drugs is present.

      D.    <u>Profit</u>

Courts consider the extent of "defendant's profits from the violations" in setting the penalty for civil CSA violations. <u>Advance Pharmaceutical</u>, 391 F.3d 377, 399 (2d Cir. 2004). For instance, a court acts "well within its discretion" when it selects a civil penalty designed to "divest defendants of all profits made in connection with the [unlawful] transactions." <u>Id.</u> at 399–400.

Here, the court does not consider profit to be a major factor in determining Dr. Ahuja's penalty, because the evidence does not support a finding that Dr. Ahuja made a large profit as a result of his violations.

      E.    <u>Ability to Pay</u>

In setting the penalties amount, a court considers whether the "defendant['s] financial condition evidence[s] an ability to pay" the penalty under consideration. <u>Advance Pharmaceutical</u>, 391 F.3d at 400. For example, in <u>Advance Pharmaceutical</u>, the district court reasonably determined that the defendant's operations had not "been so adversely affected by the enforcement action that they could not pay" the amount that the district court was considering and properly credited "expert opinion indicating the company's ability to continue operating profitably as well as evidence that defendants had engaged in a series of suspicious loans to shield" some assets. <u>Id.</u> at 400. The Circuit thus concluded that the district court's penalty was not excessive. <u>See</u>

id. at 400. Conversely, where a doctor had only a "moderate ability to pay a civil fine," a court in the Northern District of Ohio decided to assess a fine that only doubled the street value of the drugs involved in the doctor's violations—even where a fine that trebled the street value of these drugs would "certainly" have been "reasonable." Bizga, 2014 WL 11370407, at *6.

The burden is on the defendant to produce evidence of an inability to pay. See Motorola Credit Corp. v. Uzan, 509 F.3d 74, 84 (2d Cir. 2007) ("The incompleteness of the record as to [a defendant's] net worth is not a basis for reducing the punitive damages award against him, for it is the defendant's burden to show that his financial circumstances warrant a limitation of the award . . . [T]he decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this considered in mitigation of damages."); Provost, 262 F.3d at 163 ("The duty [ ] is on the defendant to present evidence . . . of his limited resources if he wishes that factor to be weighed in the calculation of punitive damages.").

Dr. Ahuja introduced some evidence about his financial ability, or lack thereof. However, the court is not persuaded that he is incapable of paying a substantial penalty. He has substantial future earnings and appears to have some assets. The court finds that Dr. Ahuja has not met his burden of showing an inability to pay the penalty that the court will impose upon him.

## VI.    CONCLUSION

The court finds that Dr. Ahuja's level of culpability weighs in favor of imposition of a substantially stringent penalty, because Dr. Ahuja engaged in numerous violations over several years demonstrated gross negligence, even reckless conduct, and

provided misleading information to investigators.  The court finds that the level of public harm weighs in favor of imposition of a severe penalty, as well.  The court finds that the profit factor weighs in favor of imposition of a lighter penalty, because there is inadequate evidence to support a finding that Dr. Ahuja made a substantial profit from his violations.  Lastly, the court finds that Dr. Ahuja has the ability to pay a substantial penalty, that the court plans to impose.  The court considers and weighs these factors together in assessing its penalty.

Dr. Ahuja is hereby **ORDERED** to pay a civil penalty of $200,000, and to comply with all federal laws and regulations pertaining to receipts, dispensations, and inventories of controlled substances in the future.

**SO ORDERED.**

Dated at New Haven, Connecticut this 5th day of May, 2017.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge